USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 1, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

RICHARD SALVATIERRA,

                   Plaintiff,

           -against-

SUPERINTENDENT WILLIAM CONNOLLY,
CORRECTIONAL OFFICER MONTGOMERY,
SERGEANT TELESCO,
CORRECTIONAL OFFICER LUJAN,
CORRECTIONAL OFFICER S. CROOM,
DOCTOR MAMIS,
CAPTAIN PELC, and
SENIOR CORRECTIONAL OFFICER C. GOOD,

                  Defendants.

-------------------------------------------------------------------X

09 Civ. 3722 (SHS) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:**

In this 42 U.S.C. § 1983 action, *pro se* plaintiff Richard Salvatierra ("Plaintiff"), an

inmate at the Fishkill Correctional Facility in Beacon, New York ("Fishkill Correctional

Facility" or "Fishkill"), alleges that, while incarcerated, his constitutional rights were violated by

certain correctional officers, their supervisors, and a physician on the facility's staff

(collectively, "Defendants").[1]  Specifically, Plaintiff alleges that he was assaulted based on his

religion, retaliated against in response to his constitutionally protected speech, improperly denied

medical care, subjected to malicious interference with his parole release hearing, and denied

---

[1] Defendants' full names have been provided in Defendants' Notice of Motion To
Dismiss, dated Feb. 17, 2010 (Dkt. 21).  They are Superintendent William J. Connolly
("Connolly"), Correction Officers Keith J. Montgomery ("Montgomery"), Carmela Lujan
("Lujan"), and Simon Croom ("Croom"), Sergeant Joseph Telesco ("Telesco"), Dr. Harry Mamis
("Mamis"), Captain Arlen Pelc ("Pelc"), and Correctional Counselor Carl Good ("Good").

meaningful access to courts, all in violation of his rights under the First, Eighth, and 14th Amendments of the Constitution.

In 2009, Plaintiff moved by order to show cause for a temporary restraining order and preliminary injunction requiring Defendants to provide him with access to the law library and a transfer to a different facility. (*See* Dkts. 5, 6.) The Court declined to issue Plaintiff's proposed order, and instead converted Plaintiff's application to a motion for a preliminary injunction. On February 17, 2010, Defendants opposed Plaintiff's request for injunctive relief, and moved to dismiss the Complaint for failure to state any claim upon which relief can be granted. (*See* Dkt. 21; *see also* Memorandum Of Law In Support Of Motion To Dismiss, dated Feb. 17, 2010 (Dkt. 22) ("Def. Mem.").)[2] In May 2010, Plaintiff submitted to the Court three sworn affirmations, with exhibits, in opposition to Defendants' motion to dismiss. (*See* Plaintiff's Affirmation in Opposition to Defendant's Motion to Dismiss, dated May 10, 2010 (Dkt. 32) ("Pl. Aff."); *see also* [Additional] Affirmation in Support of Opposition to Defendant's Motion to Dismiss, dated May 10, 2010 (Dkt. 33); Reply Affirmation in Opposition [to] Defendant's Motion to Dismiss, dated May 10, 2010 (Dkt. 34).) Defendants filed their reply on June 22, 2010. (*See* Defendants' Reply Memorandum Of Law In Further Support Of Motion To Dismiss, dated June 22, 2010 (Dkt. 31) ("Def. Reply Mem.").)

For the reasons set forth below, I respectfully recommend that Plaintiff's motion for a preliminary injunction (Dkt. 5) be denied. I further recommend that Defendants' motion to dismiss (Dkt. 21) be granted in part and denied in part, as set forth below.

---

[2] At that time, Defendants also filed a Local Rule 12.1 statement warning Plaintiff that, because Defendants had submitted additional written materials to support their motion, the Court might treat their motion as one for summary judgment. (Dkt. 25.)

## BACKGROUND

Plaintiff's Complaint, dated March 3, 2009 ("Compl.") (Dkt. 2), along with materials Plaintiff submits in opposition to Defendants' motion (*e.g.*, Pl. Aff.),[3] allege the following facts:

During the relevant time period, Plaintiff, who describes himself as a "Jewish convert," was incarcerated at Fishkill, a New York State Department of Correctional Services ("DOCS") facility.  (*See* Compl., ¶ II(A); Pl. Aff., ¶ 4.)  Following a parole release hearing on February 17, 2009, Plaintiff was denied parole based upon purportedly "erroneous information that [was not reflected] in [his] parole and prison file, *i.e., that [he] had incurred a serious disciplinary misbehavior report of a 'Tier III on March 2008.'*"  (Pl. Aff., ¶ 12; Compl., Attachment at D (emphasis in original).)

The vast majority of the conduct at issue in this case occurred during the months leading up to Plaintiff's parole hearing.  Plaintiff alleges that, during that time, he and another inmate, Edward Chaez ("Chaez"), "were consistently preparing [them]selves for [their] parole release hearing[s]," and that the two "would be at the law library [from] 8:00 am until 9:00 pm, five days a week[,] and on the weekends 8:00 am – 3:15 pm."  (*Id.*, Attachment at A.)

---

[3] The mandate that a *pro se* plaintiff's complaint be construed liberally makes it appropriate for the Court to consider the factual allegations in the plaintiff's opposition materials to supplement the allegations in the complaint.  *See Burgess v. Goord*, No. 98 Civ. 2077 (SAS), 1999 U.S. Dist. LEXIS 611, at *1 n.1 (S.D.N.Y. Jan 26, 1999) ("In general, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss.  However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." (internal quotation marks and citations omitted)); *see also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

### A.     Alleged Assault by Montgomery

The first incident of which Plaintiff complains allegedly occurred on November 12, 2008, in the Fishkill "mess hall."  (Compl., ¶ II(D).)  At that time, according to Plaintiff, "Defendant Montgomery, in the presence of Defendant Telesco, forcefully slam[m]ed [Plaintiff] on the face with a Kosher diet religious dinner bag that [Plaintiff] received and called [Plaintiff's] Kosher diet a 'F---ing meal.'"  (*Id.* (alteration in original).)  Plaintiff felt that he was being discriminated against because of his religion.  (*Id.*)  Although Telesco supposedly witnessed the incident, he "did not do anything to reprimand Defendant Montgomery."  (*Id.*)  The incident was also witnessed by other inmates, including Chaez.  (*Id.*)  As a result of this incident, Plaintiff contends that he "had to stop permanently eating [his] Kosher meal at 4:00 p[.]m. just to avoid any further problems with [Officer] Montgomery."  (Pl. Aff., ¶ 4.)

### B.     Grievances Filed by Plaintiff and Chaez, and Purported Retaliation Against Chaez

Soon after the incident, Plaintiff started writing a grievance about what had happened.  (*See* Compl., ¶ II(D).)   Plaintiff alleges that, on November 19, 2008, defendant Lujan, who was the supervisor of Fishkill's law library, improperly looked at the contents of Plaintiff's not-yet-filed grievance concerning the Kosher food bag incident, which included the identities of witnesses that Plaintiff hoped to keep confidential at that time.  (*Id.*)  Lujan also allegedly read part of Plaintiff's Article 78 petition.  (*Id.*)  Plaintiff and Chaez both filed grievances concerning Lujan's viewing of Plaintiff's not-yet-filed grievance.  (*Id.*)

4

On November 25, 2008, Plaintiff filed his grievance about the Kosher food bag incident. (*Id.*, Attachment at A.)  In his grievance, Plaintiff stated that he had been on his way out of the mess hall when Montgomery had stopped him and said, "What did I tell you before, we had this conversation before, I don't like drive by's.  I told you when you started receiving this fucking meal that you must stop for me to check!"  (Pl. Aff., Ex. 1, sheet 2 (internal quotation marks omitted).)  Plaintiff also stated that Telesco had been standing close by – only "18 inches" from Montgomery.  (*Id.*)  Plaintiff further stated that, on the day after the incident, Montgomery inspected the bag containing Plaintiff's Kosher meal, and laughed and yelled at Plaintiff.  (*See id.*, Ex. 1, sheet 7.)

On November 29, 2008, four days after Plaintiff filed his grievance about Montgomery and Telesco, and only two weeks before Chaez's parole release hearing, defendant Croom allegedly filed a false misbehavior report against inmate Chaez.  (Compl., Attachment at A.)  At a hearing on the charges against him, Chaez called Plaintiff to testify on his behalf.  (*Id.*)  Plaintiff testified that Croom's allegedly false misbehavior report against Chaez may have been "related" to grievances that both Chaez and Plaintiff had filed.  (*Id.*)  Plaintiff also filed his own grievance against Croom, complaining of Croom's purportedly false accusations against Chaez. (*See* Pl. Aff. at ¶ 5.)

## C.    The Allegedly False Charges Against Plaintiff, and Plaintiff's Resulting Work Detail

On November 30, 2008, an individual named Dawley[4] wrote an allegedly false misbehavior report against Plaintiff.  (Compl., Attachment at A.)  Plaintiff alleges that Dawley wrote this false report in retaliation for Plaintiff's grievance concerning Dawley's supervisor (Telesco) and co-workers.  (*Id.*)  After being informed that he could not file a grievance about a false misbehavior report, Plaintiff appealed the charges contained in the misbehavior report and, in his appeal, expressed concerns that the report had been retaliatory.  (*Id.*)  He also told defendant Connolly (the superintendent of the facility) that Dawley's report had been retaliatory. (*Id.*)

As an alleged result of Dawley's report or Plaintiff's subsequent response, Plaintiff was assigned to a work detail supervised by Montgomery, Croom, and Telesco.  (*Id.*, Attachment at A-B.)  This was the same work detail to which Chaez had been assigned when he received the purportedly false misbehavior report from Croom on November 29, 2008.  (*Id.*, Attachment at A.)  Being assigned to this work detail caused Plaintiff to fear retaliation by Montgomery, Croom, and Telesco.  (*Id.*, Attachment at B.)  In early December, Plaintiff wrote to Connolly and

---

[4] Dawley is not currently a defendant in this action.  Although Plaintiff refers to Dawley as "Defendant Dawley" in the Complaint's recitation of facts, Dawley is not listed as a defendant in the Complaint's caption and has not been served with process. (Pl. Aff., ¶ 2.)  As Plaintiff appears to acknowledge, he must amend his complaint and serve Dawley if he wishes to pursue any claims against Dawley.  (*See id.*)  The Court advises Plaintiff that naming an individual in a complaint's recitation of facts is not sufficient to toll the statute of limitations as to any claims against that individual.  *See Flemming v. City of New York*, No. 03-CV-0662 (NGG) (LB), 2006 U.S. Dist. LEXIS 73298, at *10 (E.D.N.Y. Sept. 29, 2006) (alerting plaintiff, a *pro se* prisoner, that "there is no tolling of the statute of limitations for failure to identify unnamed defendants").  Thus, if Plaintiff wishes to amend his Complaint to add Dawley as a defendant, he should promptly file a motion for leave to amend.  A form for such motion may be obtained from the Court's *Pro Se* Office.

Ms. Stone (the grievance program supervisor), stating that he feared retaliation because of his work detail assignment; Plaintiff requested "immediate intervention." (*Id.*) Plaintiff received no response to his request until the middle of December, when he received a letter from the Assistant Commissioner of DOCS stating that Plaintiff's safety concerns were meritless and expressing the view that Plaintiff was only worried about his parole board hearing. (*Id.*; *id.*, Attachment at C.)

### D.   Plaintiff's Back Injury and Alleged Denial of Treatment

Plaintiff alleges that, on December 4, 2008, finding himself alone in a long corridor and fearful because of Croom's recent retaliation against Chaez, he rushed to catch up with others and, as a result, "accident[ally]" fell down the stairwell and injured his back. (*Id.,* Attachment at A-B; Pl. Aff., ¶ 7.) The next day, a Friday, Plaintiff was seen by defendant Mamis, a physician at Fishkill, and he told Mamis that he was suffering "unbearable," "acute" pain in his back. (Compl., Attachment at B.) Mamis examined Plaintiff and prescribed ibuprofen (rather than any stronger pain medication[5]), and a day's rest (*id.*; Pl. Aff., ¶ 8). Plaintiff returned to the infirmary later that day "as an emergency case" because he was allegedly in "deep" pain. (Compl., Attachment at B; *see also* Pl. Aff., ¶ 8 (stating that his pain was so intense that he "could not even sit down on the toilet bowl and [he] dared not to eat the whole day in order to avoid having to use the bathroom").) The physician who spoke with Plaintiff's nurse at that time

---

[5] Plaintiff apparently does not consider ibuprofen to be a pain medication (*see id.* (stating "he did not provide me with any pain medication to relieve the pain, all what he gave me was to take the day off and keep drinking ibuprofen")), although the Court takes judicial notice that ibuprofen is "used to relieve mild to moderate pain" (MedlinePlus, "Ibuprofen," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html).

prescribed Percocet[6] for Plaintiff, as well as two more days off, and instructed Plaintiff to see Mamis on Monday.  (Compl., Attachment at B.)  That weekend, a sergeant interviewed Plaintiff about the "retaliation issue" but Plaintiff states that he was so heavily medicated that he had difficulty explaining his concerns.  (*Id.*)

Plaintiff went to his scheduled appointment with Mamis at the infirmary on Monday, December 8, 2008.  (*See id.*)  According to Plaintiff, though, Mamis refused to see him and merely discontinued the Percocet prescription that had been ordered by the other doctor; Mamis also refused to prescribe any further days of rest.  (*Id.*; Pl. Aff. at ¶ 9.)  Plaintiff returned to the infirmary later that day because of alleged intense pain, but Mamis had purportedly "instructed all the nurses that no one [was to] provide [Plaintiff] with any pain medication nor allow [him] to be attended by any 'on-call-physician.'"  (Pl. Aff. at ¶ 9; Compl., Attachment at B.)  Mamis did see Plaintiff the following day, but again denied him any pain medication other than ibuprofen.  (Compl., Attachment at C.)  Plaintiff told Dr. Mamis that he was suffering unbearable pain, but Dr. Mamis told Plaintiff that there was "nothing wrong with [him]" and allegedly dismissed Plaintiff from his office "unprofessional[ly]."  (*Id.*)  For the next three to five days, Plaintiff claims to have suffered "extreme pain in [his] lower back" (Pl. Aff., ¶ 9), treating himself by using another inmate's analgesic cream, by taking hot showers, and by strapping cardboard to his back (Compl., Attachment at C).  Plaintiff's pain then diminished.  (*Id.*)

---

[6] Percocet, which Plaintiff describes as a "pain alleviator," is intended to be used for "the relief of moderate to moderately severe pain."  DailyMed Current Medication Information, "Percocet," http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=17412.

### E.      Plaintiff's Transfer to the SHU and His Allegedly Stolen Documents

Plaintiff alleges that, on February 10, 2009, his legal mail was delivered to him open.

(*Id.*, Attachment at D.)[7]  He then claims that, a few days later, Croom stole legal papers from his

cell.  Specifically, Plaintiff explains that, by February 15, 2009, two days before the scheduled

date of his parole release hearing, he had collected and prepared multiple documents in

anticipation of the hearing.  (*Id.*, Attachment at E.)  In particular, Plaintiff had prepared a report

which, according to him, provided "insight" into his crimes, convictions, and personal

background, as well as the background of his victim.  (*Id.*)  He had also prepared a parole release

plan.  (*Id.*)  Plaintiff had letters from family, friends, and "therapeutic agencies" written in

support of his parole application and release plan.  (*Id.*)  He had certificates of therapeutic,

vocational and education achievements and "Certificates of Earned Eligibility under Correctional

Law § 805."  (Pl. Aff., ¶ 12.)  Plaintiff also had a copy of his Pre-Sentence Investigation Report,

as well as other documents he had received from his attorney, which he planned to present in

support of his release.  (Compl., Attachment at E.)  Plaintiff contends that these documents were

confidential and "not for public use."  (*Id.*)

On February 15, 2009, Croom entered Plaintiff's cell and told Plaintiff that he was going

to search the cell.  (*Id.*, Attachment at D.)  Croom instructed Plaintiff to exit the cell and place

his hands on the wall, and Plaintiff complied.  (*Id.*, Attachment at D-E.)  After Plaintiff had

---

[7] According to Plaintiff, this mail contained the Assistant Attorney General's answer to
Plaintiff's "petition" (presumably his Article 78 petition).  (*Id.*)  The officer distributing the mail
told Plaintiff that it had been opened by another inmate with a similar name who had mistakenly
received the mail.  (*Id.*)  The officer further said that she not checked the other inmate's
identification before giving him Plaintiff's mail.  (*Id.*)  Plaintiff does not appear to allege that any
of the Defendants were directly involved in this incident.

waited outside his cell for approximately five minutes, a sergeant (identified by Plaintiff as

"Sergeant Doe") approached Plaintiff. (*Id.*, Attachment at E.) This sergeant asked if Plaintiff

had any problems with the sergeant's officers. (*Id.*) Plaintiff said he did not. (*Id.*) The sergeant

then told Plaintiff, "well[,] my Officer says you have a problem with him." (*Id.*) Croom, who

was still present, then agreed, saying, "'Yea[h], you know what you said to me in there!'" (*Id.*)

According to Plaintiff, he "very quietly and respectful[ly]" denied knowing what Croom was

talking about. (*Id.*) The sergeant responded, "'Well, this is a credibility issue. I am going to

believe my officer over you and that is it. You can't stay here.'" (*Id.*) Plaintiff was then

handcuffed and escorted to the SHU.[8] (*Id.*) That day, Croom filed an allegedly retaliatory

Tier II Misbehavior Report, falsely stating that Plaintiff had cursed at him and disobeyed a direct

order. (*See id.*, Attachment at H; Pl. Aff at ¶ 5; *id.*, Ex. 16, sheet 4 (Croom's Misbehavior

Report, dated Feb. 15, 2009).)

Plaintiff was processed, escorted to a cell, and left alone in the cell. (Compl., Attachment

at F.) Plaintiff asked a sergeant if he could speak to a mental health specialist. (*Id.*) Two mental

health nurses arrived and Plaintiff told them that he was in a "state of shock, because [he] didn't

do anything [wrong]." (*Id.*) Very early the next morning, at approximately 1:20 a.m., Plaintiff

was permitted to collect his personal property that had been left behind when he was taken to the

SHU. (*Id.*) At that point, he discovered that his legal papers were missing; according to

Plaintiff, Croom had intentionally stolen them to interfere with Plaintiff's parole release hearing.

(*Id.*) Plaintiff states that he spent the whole night "crying, scared, and very depressed," and, for

---

[8] At this point in his Complaint, Plaintiff actually alleges that he was escorted to "keeplock" (*see id.*), but he later appears to define "keeplock" as the SHU. (*See id.,* Attachment at F.)

the next two days, had no appetite and did not sleep at all.  (*Id.*)  He states that he was awake for more than 60 hours straight thinking about the harm inflicted by Croom's theft of his legal papers.  (*Id.*, Attachment at F-G.)

On the following day, February 17, 2009, Plaintiff presented his case at his scheduled parole release hearing without his legal papers.  (*Id.*)  Plaintiff was denied parole based upon what he claims was an erroneous conclusion that he had received a "serious [Tier III] disciplinary misbehavior report" in March 2008.  (Pl. Aff., ¶ 12.)  Plaintiff asserts that, if he had had his legal papers at the hearing, he would have been able to demonstrate that he never received such a misbehavior report in March 2008, because his papers had contained the institutional records showing how many disciplinary reports he had received during his incarceration.  (*Id.*)

Plaintiff explains that he did not follow the customary "grievance" procedures in response to Croom's alleged theft of his legal papers, because Plaintiff was in solitary confinement without telephone access and feared being retaliated against under those conditions. (*Id.*, ¶ 15.)  Instead, on February 19, 2009 (approximately two weeks before he filed his Complaint in this action[9]), Plaintiff wrote and filed a complaint directly with Connolly and Deputy Commissioner Lucien J. Leclaire, Jr. ("Leclaire").  (*Id.*, ¶ 14.)  Plaintiff filed another complaint about his legal documents with Connolly and Leclaire on March 5, 2009.  (*Id.*) Plaintiff alleges that this course of action was recommended by Keith Zabel, a Correctional

---

[9] Although the Court's docket reflects a filing date of April 13, 2009 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the Complaint to have been filed on March 3, 2009, the date when Plaintiff signed it, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

Facility Specialist.  (*Id.*, ¶ 15.)  On March 19, 2009, Plaintiff received a letter from Leclaire

stating, in relevant part:

> Your letter indicates that you have appraised [*sic*] the
> superintendent of your lost documents issue.  Therefore, a member
> of my staff contacted facility officials at Fishkill.  Facility officials
> report that your <u>complaint</u> is currently being investigated at the
> facility level, which is the appropriate mechanism for addressing
> your concerns.  Please allow facility officials time to investigate
> and respond to your issues.

(*Id.* (underlining by Plaintiff).)

### F.    <u>Plaintiff's Alleged Denial of Access to Legal Materials</u>

Plaintiff asserts that, soon after his parole release hearing, he submitted requests to

defendants Pelc, Connolly, and Good, seeking access to the Fishkill law library, legal materials,

and writing supplies.  (*Id.*, Attachment at H; Pl. Aff. at ¶ 16.)  Despite these requests, Plaintiff

contends that he has not been provided "the full services to have access to the library," and has

not been provided with the assistance of a law library clerk.  (Compl., Attachment at H.)

Furthermore, Plaintiff alleges that, during the time when he was in solitary confinement,

following his parole hearing, Lujan intentionally denied Plaintiff law library access.  (Pl. Aff. at

¶ 16.)

Plaintiff claims that he has suffered the following harm as a result of his alleged difficulty

accessing the law library, legal materials, supplies, and legal assistance:  (1) he could not prepare

a reasonable defense at his Tier II disciplinary hearing because he did not receive the assistance

of a law library clerk (Compl., Attachment at H); (2) after he was wrongly found guilty of the

Tier II disciplinary charges in February 2009, he was unable to obtain legal materials or writing

materials during the 72-hour period he had to appeal that ruling (*id.*); (3) he was forced to write

12

portions of his Complaint on the backs of other printed documents and forms, instead of on blank paper, because he was denied writing materials (*id.*); and (4) he was unable to copy legal papers, including his Complaint in this action, before filing them, and thus could only file one copy of his Complaint when he initially submitted it to this Court (*id.*).[10]  Plaintiff further states that he had to file a reply in his Article 78 action during the time that he was allegedly denied access to the law library and legal materials, but he does not allege any additional facts concerning that action, his reply, or the action's outcome.  (*See* Compl., Attachment at H.)

In his initial application for a temporary restraining order and a preliminary injunction, Plaintiff requested a transfer to another facility in light of his difficulty accessing Fishkill's law library, and further to avoid potential retaliation by the defendants in this action.  (Dkts. 5-6; *see also* Compl., Attachment at H.)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).  Further, "'[a]lthough a court should generally refrain from considering matters outside the pleadings when reviewing a 12(b)(6) motion to dismiss, the mandate to liberally construe *pro se* pleadings

---

[10] Plaintiff also complains that he never received from this Court's *Pro Se* Office a copy of the declaration and exhibits that he had allegedly submitted to the Court in support of his application for a temporary restraining order and preliminary injunction.  (Pl. Aff. at ¶ 16.)

makes it appropriate to consider the facts set forth in plaintiff's opposition papers.'" *Falso v. Gates Chili Cent. Sch. Dist.,* 680 F. Supp. 2d 465, 466 (W.D.N.Y. 2010) (quoting *Acheampong v. United States*, Nos. 99 Civ. 2169 (SWK), 99 Civ. 3491 (SWK), 2000 U.S. Dist. LEXIS 12775, at *11 (S.D.N.Y. Sept. 5, 2000)); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (noting that "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest'" (collecting authority)).   A *pro se* complaint is to be read liberally and held to "less stringent standards" than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  "[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 795-96 (2d Cir. 1999) (quotation marks and citation omitted).

Nonetheless, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quotation marks, citation and alterations omitted).  In addition, even plaintiffs who are proceeding *pro se* must comply with any relevant procedural and substantive rules, and, to survive a motion to dismiss, a *pro se* complaint, like any other complaint, must plead enough facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  In other words, a plaintiff is required to amplify a claim with some factual allegations so as to allow the

14

Court to draw the reasonable inference that the defendant is liable for the alleged conduct. *Iqbal*, 129 S. Ct. at 1949.

### B.     Exhaustion Under the PLRA

All claims of misconduct regarding prison conditions must be exhausted before they can be raised in this Court. *Mateo v. Alexander*, 08 Civ. 8797 (RJH) (DCF), 2010 U.S. Dist. LEXIS 11270, at *8 (S.D.N.Y. Feb. 9, 2010) ("[w]hen a prisoner does not properly exhaust his administrative remedies before filing suit, the action must be dismissed" (citing *Burgos v. Craig*, No. 06-5505, 307 Fed. Appx. 469, 470 (2d Cir. 2008) ("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient."))). The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that this exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The New York State Department of Correctional Services has established an Inmate Grievance Procedure ("IGP") to provide prisoners with an administrative forum in which to bring their grievances. *See* N.Y. Correct. Law § 139; N.Y. Compl. Codes R. & Regs. tit. 7 § 701. The regulations establish a three-step inmate grievance process. *See id.*, § 701.05(b-d). First, the inmate must file a complaint with the inmate grievance resolution committee ("IGRC"). *Id.*, § 701.05(a)(1). The IGRC must then investigate and resolve the complaint

15

informally or following a hearing to be held within 16 days.  *Id.*, § 701.05(b)(1-2).  The inmate

may then appeal to the Superintendent of the facility.  *Id.*, § 701.05(c)(1).  Finally, after

receiving the Superintendent's decision, the inmate may appeal to the Central Office Review

Committee ("CORC").  *Id.*, § 701.05(d)(1).

DOCS also has an "expedited" grievance process for "harassment" grievances, N.Y.

Compl. Codes R. & Regs. tit. 7 § 701.08, which pertains to "[e]mployee conduct meant to annoy,

intimidate, or harm an inmate," *id.* § 701.02(e).  "A harassment grievance is sent directly to the

superintendent."  *Espinal v. Goord*, 558 F.3d 119, 125 (2d Cir. 2009) (citation omitted).  If the

grievance raises a "*bona fide*" harassment issue, the superintendent must order an investigation

and render a decision, which the prisoner may then appeal to the CORC.  *Id.*

Before bringing suit, an inmate must exhaust his claims through each level of the

grievance process.  *See Booth v. Churner*, 532 U.S. 731, 736-38 (2001); *Mateo v. Alexander*,

2010 U.S. Dist. LEXIS 11270, at *8-10.  Because dismissal on the basis of failure to exhaust is

mandatory, an inmate's claims can only proceed in this Court if, as to each claim, he has

exhausted all available administrative remedies, including all appellate remedies provided within

the DOCS system.  *See Porter*, 534 U.S. at 524 (citing *Booth*, 532 U.S. at 739); *Torres v. Carry*,

691 F. Supp. 2d 366, 370 (S.D.N.Y. 2009); *Bain v. Velez*, No. 09 Civ. 2316 (DLC), 2010 U.S.

Dist. LEXIS 14826, at *8-9 (S.D.N.Y. Feb. 19, 2010).  The Supreme Court has made clear that

the PLRA requires "proper exhaustion," which means "using all steps that the agency holds out,

and doing so properly (so that the agency addresses the issues on the merits)."  *Woodford v. Ngo*,

548 U.S. 81, 90 (2006) (internal quotation marks and citation omitted).  "Proper exhaustion

demands compliance with an agency's deadlines and other critical procedural rules."  *Id.*

Therefore "untimely or otherwise procedurally defective administrative grievance[s] or appeal[s]" do not satisfy the PLRA's exhaustion requirement. *Id.* at 83-84.

The exhaustion requirement may, however, be excused under certain limited circumstances. Under the law of this circuit, courts engage in a three-part inquiry to determine whether an inmate's action should be dismissed for failure to satisfy the PLRA's exhaustion requirement. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). First, the Court asks whether administrative remedies were, in fact, available to the plaintiff. *Id.* Second, the Court should "inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, . . . or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Finally, the Court should "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.'" *Id.* (quoting *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004)).[11]

Where a plaintiff concedes lack of exhaustion, or non-exhaustion is otherwise apparent from the face of the complaint, a court may decide the exhaustion issue on a Rule 12(b)(6) motion. *See Shaw v. City of New York*, No. 08 Civ. 3997 (SHS) (JCF), 2009 U.S. Dist. LEXIS

---

[11] "Courts in this circuit have acknowledged the tension between *Woodford* and the *Hemphill* analysis, but have continued to use the *Hemphill* test in the absence of circuit authority to the contrary." *Mateo v. O'Connor*, No. 08 Civ. 11053 (RJH) (DF), 2010 U.S. Dist. LEXIS 81972, at *13 n.6 (S.D.N.Y. Aug. 12, 2010) (citing cases); *see also Shariff v. Coombe*, 655 F. Supp. 2d 274, 285 n.7 (S.D.N.Y. 2009) ("There appears to be some debate as to whether the *Hemphill* three-part test survives the Supreme Court's decision in *Woodford* . . . Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in recent cases." (citing *Vogelfang v. Riverhead County Jail Officers*, No. 07-1268-cv, 2009 U.S. App. LEXIS 1914, at *5 (2d Cir. Feb. 2, 2009))).

39836, at *8-9 (S.D.N.Y. Apr. 21, 2009) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 251

(S.D.N.Y. 2003).  If non-exhaustion is not clear from the face of the complaint, the court may

convert the defendant's motion to one for summary judgment "'limited to the narrow issue of

exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust,

whether remedies were available, or whether exhaustion might be, in very limited circumstances,

excused.'"  *Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, at *5 (quoting *McCoy*, 255 F.

Supp. 2d at 251).

## II.     DEFENDANTS' MOTION TO DISMISS

Defendants move to dismiss Plaintiff's claims on a number of grounds, arguing that:

(1) Plaintiff's claims must be dismissed insofar as they seek damages from Defendants in their

official, as opposed to personal, capacities; (2) Plaintiff has failed to state a claim for excessive

use of force; (3) Plaintiff has failed to state a religious rights claim under either the First

Amendment or the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA");

(4) Plaintiff has failed to state a claim against defendant Lujan based upon her alleged reading of

Plaintiff's grievance and legal papers; (5) Plaintiff has failed to state a claim for retaliation

against any defendant; (6) defendant Croom's alleged theft of Plaintiff's legal papers does not

give rise to any claim cognizable before this Court, and, in any event, Plaintiff failed to exhaust

any such claim; (7) Plaintiff has failed to state an access to courts claim, and, in any event,

Plaintiff failed to exhaust such a claim; (8) Plaintiff has failed to state any claim against

defendant Good; (9) Plaintiff has failed to state a claim for medical deliberate indifference; and

(10) the doctrine of qualified immunity shields all Defendants from liability.  Each of these

arguments is discussed below.

18

A.    **Claims Against Defendants in Their Official Capacities**[12]

Defendants move to dismiss Plaintiff's claims to the extent Plaintiff seeks damages from

Defendants in their official, as opposed to personal, capacities.  (*See* Def. Mem. at 8 (citing

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).)  Although Plaintiff does not explicitly

state that he is seeking damages from Defendants in their official capacities (*see generally*

Compl.), Defendants are correct that such damages would not be recoverable in this

Section 1983 action.  *See, e.g.*, *Collins v. Goord*, 438 F. Supp. 2d 399, 415 n.17 (S.D.N.Y. 2006)

("[p]laintiff may not seek money damages against the defendants in their official capacities

because state employees are not subject to such suits [under Section 1983]").

An action against a public servant in his official capacity is treated as a suit against the

relevant governmental agency itself, *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007), and

a municipality – or an agency thereof – is a "person" for purposes of Section 1983 and, therefore,

may be sued thereunder, *see Monell v. City of New York Department of Social Services*, 436 U.S.

658 (1978); *Reynolds*, 506 F.3d at 190.  In order to recover against a municipal agency, however,

a plaintiff must plead and prove that the deprivation of his rights was caused by the execution of

an official policy or custom of the agency.  *Monell*, 436 U.S. at 694; *Walker v. City of New York*,

974 F.2d 293, 296 (2d Cir. 1992).

In order to meet *Monell*'s requirements, a plaintiff need not point to an official agency

rule or regulation that caused the deprivation of his rights.  *Patterson v. County of Oneida*, 375

F.3d 206, 226 (2d Cir. 2004).  Rather, a plaintiff can plead and seek to prove that the unlawful

---

[12] Plaintiff does not specify in his Complaint whether he is attempting to sue Defendants in their individual or official capacities.  Affording his pleading a liberal construction, the Court will consider both possibilities.

practices of the agency's subordinates "are 'so permanent and well settled as to constitute a custom or usage with the force of law,' thereby implying the constructive acquiescence of policy-making officials." *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 433 (S.D.N.Y. 2006) (quotation marks omitted) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).  Moreover, a municipality may be liable under Section 1983 for a failure to train its employees, where such failure amounts to deliberate indifference to the rights of those within its jurisdiction. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).  In any event, to prevail on a *Monell* claim, a plaintiff must establish a causal link between the policy or custom and the alleged violation of his rights. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

Here, Plaintiff does not allege that any policy or custom of DOCS or Fishkill caused the deprivation of his rights.  Plaintiff's claims should therefore be dismissed insofar as they seek damages from Defendants in their official capacities and also to the extent the claims may be construed as being asserted against any governmental agencies.

### B.    Claims Against Defendants In Their Individual Capacities

Defendants contend that Plaintiff has failed to state any claim against them in their individual capacities.  (Def. Mem. at 1.)  Alternatively, Defendants argue that they are shielded from Plaintiff's claims under the doctrine of qualified immunity.

The Court will consider Plaintiff's claims against each defendant separately, except where Plaintiff has made common allegations against multiple defendants.

### 1.    Claims Against Montgomery

Plaintiff alleges that Montgomery called Plaintiff's Kosher meal a "f---ing meal" and "forcefully slam[m]ed" Plaintiff in the face with it.  (Compl., ¶ II(D).)  Plaintiff further alleges

that this incident made him feel "physically and verbally discriminated against [based upon] [his] religious practice" (*id.*) and caused him to "stop permanently eating [his] [afternoon] Kosher meal" (Pl. Aff., ¶ 4).  Based on these allegations, it appears that Plaintiff seeks to assert a claim against Montgomery for the excessive use of force under the Eighth Amendment, as well as a claim for the violation of Plaintiff's religious rights under the First Amendment and RLUIPA.  Defendants move to dismiss each of these claims.[13]  (*See* Def. Mem. at 10.)

### a.      Excessive Use of Force Claim

Defendants argue that Plaintiff has failed to state a claim for excessive use of force against Montgomery.  In the alternative, Defendants argue that the doctrine of qualified immunity shields Montgomery from such a claim.  Both arguments fail.

Defendants contend that Plaintiff has failed to state an excessive use of force claim because the alleged conduct was "de minimis."  (Def. Mem. at 8-10.)  According to Defendants, "'not every push or shove' . . . gives rise to a constitutional claim," and, here, Plaintiff's claim should be dismissed because has not alleged any physical injury.  (Def. Mem. at 9 (citing *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997).)  This argument fails because Eighth Amendment excessive use of force claims must be evaluated "based on the nature of the force[,] rather than the extent of the injury."  *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1176 (2010) (citing

---

[13] Liberally construed, Plaintiff's Complaint may also be read to plead a claim for religious discrimination under the 14th Amendment.  *See Cole v. Fischer*, No. 09-2897-pr, 2010 U.S. App. LEXIS 10832, at *7 (2d Cir. May 27, 2010) (summary order) (holding that inmate plaintiff who alleged that a correction officer had hit him in the face while making derogatory comments about the plaintiff's religion could state a 14th Amendment claim).  Defendants, however, have not moved to dismiss any 14th Amendment discrimination claim, and the Court therefore will not address such a claim here.  *See, e.g., Garcia v. Watts*, No. 08 Civ. 7778 (JSR) (HBP), 2009 U.S. Dist. LEXIS 84697, at *26 (S.D.N.Y. Aug. 27, 2009) (Report & Recommendation) (recommending that the Court not consider a claim that was not addressed in defendants' motion papers), *adopted by* 2009 U.S. Dist. LEXIS 84692 (S.D.N.Y. Sept. 1, 2009).

*Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).  The "core judicial inquiry" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Wilkins*, 130 S. Ct. at 1178 (quoting *Hudson*, 503 U.S., at 7).  In this case, Plaintiff has alleged sufficient facts which, if accepted as true, would permit a factfinder to infer that Montgomery was acting maliciously and sadistically to cause harm.

This Circuit's recent decision in *Cole v. Fischer* is squarely on point.  In that case, the District Court dismissed Plaintiff's excessive use of force claim where "the only allegation [supporting that claim was] that Correction Officer Lehoyski 'hit [] plaintiff in the face.'" *Cole v. Fischer*, 07 Cv. 11096 (BSJ), 2009 U.S. Dist. LEXIS 45403 (S.D.N.Y., May 29, 2009). The Second Circuit reversed, finding that "it is possible to infer that Lehoyski's use of force was malicious in light of Cole's allegations that Lehoyski simultaneously made racially and religiously derogatory remarks, and that the force was used just after he had turned down an offer of a corrupt deal."  *Cole v. Fischer*, 2010 U.S. App. LEXIS 10832, at *5-6.  Likewise, here, Plaintiff's allegation that Montgomery cursed Plaintiff's meal and "slam[m]ed" Plaintiff "forcefully" in the face with the meal is sufficient to give rise to an inference that Montgomery's use of force was malicious.  Defendants' motion to dismiss the excessive force claim for failure to state a claim should therefore be denied.

Defendants' motion to dismiss Plaintiff's excessive use of force claim on qualified immunity grounds should also be denied.  (*See* Def. Mem. at 20.)  The doctrine of qualified immunity "protects prison officials from personal liability for damages under § 1983 when their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Horne v. Coughlin*, 155 F.3d 26, 29 (2d Cir. 1998)

(quotation marks and alterations omitted) (quoting *Walker v. McClellan*, 126 F.3d 127, 129

(2d Cir. 1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Rodriguez v. Phillips*,

66 F.3d 470, 475 (2d Cir. 1995).  Where a right is clearly established, however, a state official is

still entitled to qualified immunity if "it was objectively reasonable for him to believe that his

actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d

Cir. 2001) (internal quotation marks and citation omitted).  Objective reasonableness is

established if "the only conclusion a reasonable jury could reach is that reasonable officers

would disagree on the constitutionality" of the official's actions. *Id.* at 203.

     Here, a prisoner's right to be free from the excessive use of force of correctional officers

was a clearly established constitutional right as of the date of the alleged assault. *See, e.g.*,

*Carter v. Kiernan*, No. 98 Civ. 2664 (JGK), 2000 U.S. Dist. LEXIS 7982 (S.D.N.Y. June 12,

2000) ("[t]here is no doubt that . . . the right of a prison inmate under the Eighth Amendment to

be free from the excessive use of force by prison officials[] was well established by February 5,

1998" (citing *Hudson*, 503 U.S. at 5)).  Furthermore, at this stage in the litigation, it cannot be

said as a matter of law that Montgomery's actions were "objectively reasonable" under the

circumstances. *See Papineau v. Parmley*, 465 F.3d 46, 61-63 (2d Cir. 2006) (Sotomayor, J.)

(rejecting defendants' motion for summary judgment based on qualified immunity where

material issues of fact remained as to whether defendants' force was reasonable); *Amaker v.*

*Haponik*, No. 98 Civ. 2663 (JGK), 2000 U.S. Dist. LEXIS 4091, at *19 (S.D.N.Y. Mar. 31,

2000) (holding that the complaint should not be dismissed on qualified immunity grounds where

"the facts [were] not sufficiently developed at this stage in the proceedings to conclude that a

reasonable officer would not have concluded that defendants' actions were unlawful"); *Burgess*, 1999 U.S. Dist. LEXIS 611, at *17-18 (although defendants argued that it was objectively reasonable for them to believe their actions were lawful, "dismissal on the basis of qualified immunity would be premature" where plaintiff had adequately pleaded a claim); *see generally King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999) (qualified immunity defense is typically addressed at the summary judgment stage because it usually depends on the facts of the case, making dismissal at the pleading stage generally inappropriate).

Accordingly, I recommend that the motion to dismiss the excessive use of force claim against Montgomery be denied.

### b.    Religious Rights Claims Under the First Amendment and RLUIPA

To state a claim under the First Amendment or under RLUIPA, a prisoner must first allege that the state imposed a "substantial burden" on his religious exercise.  *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (to state a free exercise claim under the First Amendment, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs"); *id.* at 273 (under RLUIPA, "a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling government interest by the least restrictive means" (quoting 42 U.S.C. § 2000cc-1(a))).

A substantial burden exists where "the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Muhammad v. City of New York Dep't of Corrections*, 904 F. Supp. 161, 188

24

(S.D.N.Y. 1995) (to establish that his religious exercise was substantially burdened, a plaintiff must "demonstrate that the government's action pressur[ed] him to commit an act forbidden by his religion or prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith" (internal quotation marks and citations omitted)); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (a substantial burden on religious exercise exists when "an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand'" (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963))); *see also Fortress Bible Church v. Feiner*, No. 03 Civ. 4235 (SCR), 2010 U.S. Dist. LEXIS 82043, at *242 (S.D.N.Y. Aug. 12, 2010) (noting that Congress intended the term "substantial burden" in RLUIPA to be interpreted by reference to Supreme Court jurisprudence).  This Court has explained that a "'mere inconvenience'" is insufficient to establish a substantial burden.  *Pugh v. Goord*, 571 F. Supp. 2d 477, 505 (S.D.N.Y. 2008) (quoting *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007)).  At the same time, however, demonstrating a substantial burden is "'not an onerous task for the plaintiff.'"  *Id.* (quoting *Singh v. Goord*, 520 F. Supp. 2d at 498).

In their initial moving papers, Defendants argued that Plaintiff had not stated a claim under the First Amendment or RLUIPA because Plaintiff had not alleged that Montgomery's conduct interfered with Plaintiff's religious practices in any substantial way.  (Def. Mem. at 9.) In Plaintiff's opposition, he contended that Montgomery's conduct substantially interfered with his religious practices because it caused him to discontinue receiving his afternoon Kosher meal bag.[14]  (Pl. Aff. at ¶ 4 ("I had to stop permanently eating my Kosher meal at 4:00 p[.]m. just to

---

[14] Based on Plaintiff's grievance papers, it appears that he was routinely given his meals at approximately 4:00 p.m.  (*See* Pl. Aff., Ex. 1, sheet 7.)

avoid any further problems with [Officer] Montgomery").)  In response, Defendants argue that Plaintiff's contention is misleading because, according to Plaintiff's own grievance, he received a Kosher meal the very afternoon following Montgomery's alleged assault, and, furthermore, "no reasonable inmate would have been deterred from exercising his [religious] rights by [Montgomery's alleged conduct]."  (Def. Reply Mem. at 2.)  In other words, Defendants argue that Plaintiff's "decision" to discontinue his Kosher meals was Plaintiff's "own uncoerced choice."  (*Id.* at 1.)

Defendants thus appear to move for dismissal of Plaintiff's RLUIPA and First Amendment free exercise claims on two grounds:  (1) that Plaintiff did not in fact discontinue receiving meals as he has alleged, and (2) that Montgomery's conduct did not "substantially pressure" Plaintiff to modify his behavior.  Although, on a full discovery record, Defendants may be able to demonstrate that Plaintiff's claim cannot withstand summary judgment, Defendants' current arguments are insufficient to warrant dismissal under Rule 12.

First of all, Plaintiff has alleged that he stopped eating afternoon Kosher meals as a result of Montgomery's conduct.  Although Plaintiff does not allege the exact day that he stopped receiving afternoon Kosher meals, the fair import of his submissions is that he was physically assaulted by Montgomery at mealtime on November 10, 2008, that he received a Kosher meal the next afternoon and was verbally harassed by Montgomery on that afternoon (*see* Pl. Aff., Ex. 1, sheet 7 (stating that Montgomery "laugh[ed]" and "yell[ed]" at Plaintiff)), and that he thereafter "stop[ped] permanently" eating afternoon Kosher meals "to avoid any further problems with [Officer] Montgomery" (Pl. Aff. at ¶ 4).  Although discovery may reveal that Plaintiff's dietary practices did not change as significantly as Plaintiff presently alleges,

26

Plaintiff's allegations that he was pressured to change his religious practices and that he indeed did change them are plausible under *Twombly* and should therefore be taken as true for the purposes of Defendants' motion to dismiss.

Second, on the question of whether Montgomery's alleged conduct put "substantial" pressure on Plaintiff to modify his religious practices, Defendants merely analogize Montgomery's conduct to cases regarding *"de minimis"* verbal acts of retaliation, while mischaracterizing Montgomery's alleged conduct as "mild chiding."  Defendants' argument in this regard ignores Plaintiff's key allegation – that Montgomery deliberately and "forcefully" hit him in the face with Plaintiff's Kosher meal bag – and thus fails to support dismissal.

Similarly, Defendants' conclusory assertion that Montgomery's conduct was "unrelated to the religious nature of the meal" is also insufficient to justify dismissal at this stage.  Although Montgomery apparently articulated, at the time, a non-discriminatory reason for his conduct – *i.e.,* that Plaintiff had proceeded too quickly through an inspection line (*see* Pl. Aff, Ex. 1, sheet 2), it cannot be determined from the Complaint that Montgomery's alleged assault lacked discriminatory motivation.  Rather, if Plaintiff's allegations regarding the nature of Montgomery's conduct are accepted as true, then it would appear that Montgomery's actions were significantly out of proportion with his stated motivation, and this lack of proportionality may imply the existence of an improper motive – such as religious animus – for his action.  The fact-intensive question of Montgomery's motivation would be better addressed after the parties have had the benefit of discovery.

As Plaintiff has plausibly alleged that Montgomery's purported assault substantially pressured Plaintiff to modify his religious observances, resulting in a substantial burden on

Plaintiff's religious exercise, Defendants' motion to dismiss the Complaint for failure to state RLUIPA and First Amendment free exercise claims should be denied.

Likewise, the Court should reject Defendants' argument that the doctrine of qualified immunity necessarily shields Montgomery from such claims. At the time Montgomery allegedly assaulted Plaintiff with his Kosher meal bag, the law was clearly established that Plaintiff had a constitutional right to be free from conduct that placed "substantial pressure on [him] to modify his behavior and to violate his [religious] beliefs." *See Jolly*, 76 F.3d at 477. As explained above with respect to Plaintiff's excessive use of force claim, it simply cannot be concluded at this juncture that the actions allegedly taken by Montgomery were "objectively reasonable" as a matter of law. *See Amaker*, 2000 U.S. Dist. LEXIS 4091, at *19.

I therefore recommend that the Court deny Defendants' motion to dismiss Plaintiff's RLUIPA and First Amendment Free Exercise claims against Montgomery.

### 2.      Claims Against Telesco

Plaintiff's only specific allegation against Telesco is that he witnessed the Kosher food bag incident but "did not do anything to reprimand [Officer] Montgomery." (Compl., ¶ II(D).) Plaintiff's claims against Telesco should be dismissed.

To the extent Plaintiff seeks to assert Section 1983 claims against Defendants in their individual capacities, each defendant's "personal involvement" in the alleged constitutional violation "is a prerequisite to an award of damages." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations marks and citation omitted); *accord Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987); *see also Fisk v. Letterman*, 401 F. Supp. 2d 362, 373-74 (S.D.N.Y. 2005) (dismissing the plaintiff's

§ 1983 claim where she failed to allege facts showing that the defendant had been involved in the deprivation of her rights).  In other words, to recover from a particular defendant, Plaintiff must allege "'a tangible connection'" between that defendant's alleged unconstitutional acts and the injuries suffered.  *See Gowins v. Greiner*, No. 01 Civ. 6933 (GEL), 2002 U.S. Dist. LEXIS 14098, at *20 (S.D.N.Y. July 31, 2002) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

The mere fact that an official holds a supervisory position is, standing alone, insufficient to establish that official's liability for the acts of his subordinates, although there are several ways in which a supervisory official may be found personally liable for violating a plaintiff's constitutionally protected rights.  *See Colon*, 58 F.3d at 873; *Wright v. Smith*, 21 F.3d at 501.  In *Colon v. Coughlin*, the Second Circuit held that a supervisory official may be deemed to have personal involvement where he:  (1) directly participated in the infraction; (2) failed to remedy the wrong even after learning of a violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) acted in a grossly negligent manner in managing subordinates who caused the unlawful condition or event; or (5) demonstrated deliberate indifference to the constitutional rights of the plaintiff by failing to act on information demonstrating that unconstitutional practices were taking place.  *Colon*, 58 F.3d at 873; *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001).  In *Iqbal*, however, the Supreme Court held that a supervisor's awareness of his subordinate's discriminatory intent was insufficient, by itself, to support a discrimination claim against the supervisor.  *Ashcroft v. Iqbal*, 129 S. Ct. at 1948-49.  The

Supreme Court further explained that the necessary showing of personal involvement "will vary with the constitutional provision at issue."  *Id.* at 1948.

The precedent of this Court is somewhat divided on the extent to which *Iqbal* abrogates *Colon*.  In *Bellamy v. Mount Vernon Hosp.*, for example, the Court (Scheindlin, J.) concluded that "[o]nly the first and part of the third *Colon* categories pass *Iqbal*'s muster."  No. 07 Civ. 1801 (SAS), 2009 U.S. Dist. LEXIS 54141, at *27 (S.D.N.Y. June 26, 2009), *aff'd*, 2010 U.S. App. LEXIS 14981 (2d Cir. N.Y., July 21, 2010) (summary order).  On the other hand, in *D'Olimpio v. Crisafi*, the Court (Rakoff, J.) expressed "disagree[ment]" with such an approach, and held that "the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated."  Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 U.S. Dist. LEXIS 59563, at *16-17 (S.D.N.Y. June 15, 2010).  Under either view, however, it is clear that Plaintiff has failed to allege sufficient "personal involvement" by Telesco to give rise to any claim against him.

With respect to Plaintiff's Eight Amendment excessive use of force claim, his RLUIPA claim, and his First Amendment free exercise claim, Plaintiff has not alleged that Telesco had the requisite "personal involvement" necessary to permit recovery against him.  Plaintiff's allegations against Telesco suggest only one potential basis of liability under *Colon*:  by not reprimanding Montgomery (*see* Compl., ¶ II(D)), Telesco "failed to remedy the wrong" after becoming aware of the alleged violation, *Colon*, 58 F.3d at 873.  A failure to reprimand after an assault has already taken place does not, without more, constitute a cognizable injury under the Eighth Amendment.  *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("a

supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it").  Furthermore, Plaintiff does not contend that Telesco could (or should) have tried to stop the assault as it quickly unfolded, nor does Plaintiff allege any other act or omission by Telesco – such as a failure to train – that could give rise to any claim against him. Accordingly, the claims against Telesco should be dismissed.

### 3. Claims Against Croom

Plaintiff alleges that (a) Croom filed a false misbehavior report against inmate Chaez, and (b) in retaliation for Plaintiff's testimony in Chaez's favor (which was protected speech), Croom stole Plaintiff's legal papers and filed a false misbehavior report against him.  (*See* Compl., Attachment at A (false misbehavior report against Chaez); *id.*, Attachment at F (theft of legal papers); *id.*, Attachment at H (false misbehavior report against Plaintiff); Pl. Aff. at ¶ 5 (same); *id.*, Ex. 16, sheet 4 (Croom's Misbehavior Report, dated Feb. 15, 2009).)  These claims should be dismissed because Plaintiff does not have standing to challenge Croom's alleged retaliation against another inmate and because Plaintiff's own submissions indicate that he has not exhausted his claims regarding Croom's allegedly false misbehavior report against him and the alleged theft of his legal papers.

### a. Purportedly False Misbehavior Report Filed Against Chaez

Plaintiff fails to state a claim arising from Croom's allegedly false misbehavior report filed against inmate Chaez.  As Defendants correctly argue, Plaintiff does not have standing to assert a retaliation claim on Chaez's behalf.  (*See* Def. Mem. at 13.)  Even if Croom filed a misbehavior report against Chaez in an effort to interfere with Plaintiff's grievance about the

31

Kosher food bag incident, Plaintiff has failed to allege that he actually suffered any cognizable injury as a result of the report.  Accordingly, this claim should be dismissed.

### b.   Alleged Retaliatory Misbehavior Report Against Plaintiff and Alleged Theft Of Plaintiff's Legal Papers

Defendants argue that any potential claims arising from Croom's misbehavior report against Plaintiff and the alleged theft of Plaintiff's legal papers are barred by Plaintiff's failure to exhaust such claims.  In the alternative, Defendants argue that, regardless of exhaustion, Plaintiff's allegations do not support any claim cognizable in this Court.  Defendants' first argument – that the claims should be dismissed as unexhausted – is persuasive, and thus this Court need not reach the merits of these claims.

A plaintiff need not affirmatively plead exhaustion in his complaint, *see Jones v. Bock*, 549 U.S. 199, 216 (2007), but where, as here, the Court is presented with an evidentiary record regarding exhaustion, and Plaintiff has received fair notice of the possible conversion of the motion (*see* Dkt. 25), the Court may convert a motion to dismiss for lack of exhaustion to a motion for summary judgment.  *See Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, at *4-6. In this instance, Plaintiff has provided evidence to show that he took steps to exhaust his claims against Croom, but that evidence also suggests that his efforts, to date, have not been adequate to satisfy the exhaustion requirements.

As an initial matter, Plaintiff concedes that he failed to follow standard grievance procedures with respect to his claims against Croom, but asserts that this was because of his fear of retaliation.  In this vein, he alleges that his "extraordinary circumstance[s]" in solitary confinement "chilled [him] from properly filing, in technical terms[,] a 'grievance.'"  (Pl. Aff. at ¶ 15.)  An "allegation of a generalized fear of retaliation," however, has been held to be

insufficient to excuse a plaintiff's failure to file a proper grievance. *Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) (citing cases). Further, Plaintiff's alternative approach to raising his complaints – *i.e.,* writing letters to Connolly and Leclaire concerning Croom's alleged misconduct (*see* Pl. Aff., ¶¶ 14-15 (describing letters of February 19 and March 5, 2009)) – cannot be deemed an adequate substitute for a formal grievance. *See Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, at *11 (letters to DOCS Assistant Commissioner and Inspector General's Office did not satisfy exhaustion requirement); *Harrison v. Goord*, No. 07 Civ. 1806 (HB), 2009 U.S. Dist. LEXIS 48478, at *27-29 (S.D.N.Y. June 9, 2009) (letters to prison superintendent and DOCS Commissioner did not satisfy exhaustion requirement (citing cases)); *Connor v. Hurley*, No. 00 Civ. 8354 (LTS) (AJP), 2004 U.S. Dist. LEXIS 7146, at *7 (S.D.N.Y. Apr. 26, 2004) (same); *Williams v. City of New York*, 03 Civ. 5342 (RWS), 2005 U.S. Dist. LEXIS 26143, at *29-30 (S.D.N.Y. Nov. 1, 2005) ("'[i]t is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements'" (citation omitted)); *see generally Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (merely "[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion").

Plaintiff nonetheless posits that, regardless of how he initially chose to raise his complaints, he was informed in a March 19, 2009 letter from Leclaire that the issues he had raised in his letters were being pursued by DOCS through an "appropriate mechanism for addressing [Plaintiff's] concerns." (*See* Pl. Aff. at ¶ 15.) Thus, Plaintiff appears to argue that, despite his informal approach, his letters to prison officials were accepted as a means to initiate the grievance process. Plaintiff further states, however, that he has never received a further

response (*see id.*), and he offers no evidence to demonstrate that he has gone forward to appeal the matter to the CORC, as he must, to complete the exhaustion process. *See Torres v. Carry,* 691 F. Supp. 2d 366, 370 (S.D.N.Y. 2009) (noting that the Superintendent's failure to render a timely decision regarding the plaintiff's grievance did not exempt the plaintiff from the PLRA exhaustion requirements, including filing an appeal with the CORC (citing *Arce v. Keane,* No. 01 Civ. 2648 (BSJ), 2004 U.S. Dist. LEXIS 3698, at *7 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance."); *Hernandez v. Coffey,* No. 99 Civ. 11615 (WHP), 2003 U.S. Dist. LEXIS 17091, at *13 (S.D.N.Y. Sept. 29, 2003) ("[W]here a prisoner files a grievance, and the IGRC does not respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and the CORC."))).

Accordingly, even if Plaintiff's initial letters were sufficient to substitute for an initial grievance, Plaintiff has apparently failed to exhaust his grievance through all requisite steps of the process. *See Booth v. Churner*, 532 U.S. 731, 736-38 (2001); *Santiago v. Meinsen,* 89 F. Supp. 2d 435, 440 (S.D.N.Y. 2000) (before bringing suit, an inmate must exhaust his claims through each level of the grievance process). For this reason, I recommend that Plaintiff's claims against defendant Croom be dismissed on summary judgment, without prejudice to replead, should Plaintiff be able to demonstrate, in the future, either exhaustion or adequate reasons why exhaustion should be excused. *See Mateo* v. *Alexander*, 2010 U.S. Dist. LEXIS 11270, at *4-6, 13 (converting motion to dismiss on exhaustion grounds to motion for summary judgment then dismissing without prejudice to replead).

4.   **Claims Against Dr. Mamis**

Plaintiff alleges that Dr. Mamis refused to give him any medication other than ibuprofen for his injured back and discontinued without justification the prescription for Percocet (and additional rest) that Plaintiff had received from another doctor.  (*See* Compl., Attachment at B-C; Pl. Aff., ¶ 8.)  In this regard, Plaintiff contends that Mamis violated his constitutional rights by "deliberately interfering with a recommended treatment that [he] was prescribed by another physician."  (Pl. Aff., ¶ 9.)  Under the governing legal standards, however, Plaintiff's claim against Mamis should be dismissed.

a.   **Legal Standard for Inadequate Medical
Care Claims Under the Eighth Amendment**

The Eighth Amendment protects against cruel and unusual punishment of prison inmates and has been construed to include protection against the denial of adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 U.S. Dist. LEXIS 7157, at *11-12 (S.D.N.Y. Apr. 24, 2002).  Prison officials violate this right when they are deliberately indifferent to an inmate's medical needs.  *Estelle*, 429 U.S. at 104.  The standard for determining whether officials have been deliberately indifferent includes both objective and subjective components.  *Salahuddin*, 467 F.3d at 279-280; *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

The objective component has two prongs.  First, the plaintiff's medical need must be serious.  *See Estelle*, 429 U.S. at 104; *Hathaway*, 37 F.3d at 66; *Hutchinson v. Civitella*, No. 02 Civ. 2407 (CBM), 2003 U.S. Dist. LEXIS 15417, at *14 (S.D.N.Y. Sept. 4, 2003) (citing *Flemming v. Velardi*, 02 Civ. 4113 (AKH), 2003 U.S. Dist. LEXIS 13078, at * 6 (S.D.N.Y. July

30, 2003) (citation omitted)).  This standard contemplates "a condition of urgency" that may

"produce death, degeneration or extreme pain."  *Hathaway*, 37 F.3d at 66 (citation omitted).

Such a serious medical need arises where "the failure to treat a prisoner's condition could result

in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Chance*, 143

F.3d at 702 (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *Woods*,

2002 U.S. Dist. LEXIS 7157, at *12-13.  Second, the alleged inadequacy in medical care must

also be serious.  *See Salahuddin*, 467 F.3d at 280.  To determine the seriousness of the alleged

inadequacy, the Court should consider the treatment actually provided, the impact of the

offending conduct (such as an unreasonable delay or interruption in treatment), and the

seriousness of the pertinent medical condition.  *See id.*  "Only deprivations denying the minimal

civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth

Amendment violation."  *Id.* at 279.

   Under the subjective prong of the deliberate indifference inquiry, the facts must give rise

to an inference that the person charged with providing medical care was aware of a substantial

risk of harm, and that he was "subjectively aware that his conduct create[d] such a risk."

*Salahuddin*, 467 F.3d 263, 280-81; *see also Chance*, 143 F.3d at 702 (defendant must have

known and disregarded "'an excessive risk to inmate health or safety'" (quoting *Farmer v.

Brennan,* 511 U.S. 825, 837 (1994))); *Flemming*, 2003 U.S. Dist. LEXIS 13078, at * 6; *Woods*,

2002 U.S. Dist. LEXIS 7157, at *13-14.  "'[T]he official must be both aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference.'" *Chance*, 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837); *see also Hathaway*,

37 F.3d at 66.

Allegations of differences of opinion between a prisoner and prison officials concerning the appropriate response and treatment of a medical complaint, or allegations of medical malpractice, generally do not satisfy the second prong of the standard.  *See Chance*, 143 F.3d at 703 (citing *Estelle*, 429 U.S. at 105-06); *Vento v. Lord*, No. 96 Civ. 6169 (SS), 1997 U.S. Dist. LEXIS 11022, at *11 (S.D.N.Y. July 31, 1997) ("[i]t is well established . . . that allegations of negligence, medical malpractice or claims based on difference of opinion over matters of medical judgment do not rise to an Eighth Amendment violation" (citing cases)).  Conduct may only rise to the level of deliberate indifference when it involves the requisite recklessness, "i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'"  *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (quoting *Chance*, 143 F.3d at 703); *see also Gowins v. Greiner*, 2002 U.S. Dist. LEXIS 14098, at *18-19.  Medical decisions may also constitute indifference where they are contrary to accepted medical standards, in that the doctor based his decision on something other than sound medical judgment.  *See Webb v. Jackson*, No. 92 Civ. 2149 (SS), 1994 U.S. Dist. LEXIS 3008, at *7 (S.D.N.Y. Mar. 16, 1994) (citing *Harding v. Kuhlman*, 588 F. Supp. 1315, 1316 (S.D.N.Y 1984), *aff'd,* 762 F.2d 990 (2d Cir. 1985)), *aff'd*, 47 F.3d 1158 (2d Cir. 1995) (table).

**b.    Plaintiff Has Not Stated a Claim for
Deliberate Indifference to His Medical Needs**

The essence of Plaintiff's claim against Mamis is that he failed to prescribe strong enough painkillers and sufficient time off work when treating Plaintiff's allegedly severe back pain.  (Compl., Attachment at B.)  Courts in this Circuit have consistently held that such allegations are insufficient to state a claim for deliberate indifference.  *See LaBounty v. Coombe*, No. 95 CIV. 2617 (DLC), 1996 U.S. Dist. LEXIS 17499, at *27-28 (S.D.N.Y. Nov. 26, 1996)

37

(dismissing deliberate indifference claims because, although plaintiff had allegedly been prescribed two Percocets per day by a non-party physician, the defendant physicians' less potent treatments did not violate plaintiff's constitutional rights), *aff'd, in relevant part, sub nom. LaBounty v. Kinkhabwala*, 2 Fed. Appx. 197 (2d Cir. Feb. 5, 2001); *Morrison v. Mamis*, No. 08 Civ. 4302 (PAC) (AJP), 2008 U.S. Dist. LEXIS 106416, at *42-45 (S.D.N.Y. Dec. 18, 2008) (Report & Recommendation) (where plaintiff suffered from back pain and migraines, Dr. Mamis's refusal to prescribe other painkillers or allow plaintiff to use an external analgesic did not give rise to deliberate indifference claim), *adopted by* 2009 U.S. Dist. LEXIS 61772 (S.D.N.Y. July 20, 2009); *Ceparano v. Suffolk County Dep't of Health*, No. CV 09-558 (SJF) (AKT), 2010 U.S. Dist. LEXIS 73228, at *35-37 (E.D.N.Y. Mar. 25, 2010) (Report & Recommendation) (recommending *sua sponte* dismissal of deliberate indifference claims where plaintiff alleged that, "rather than the treatments [provided], he should have instead received . . . [among other things,] a higher dosage of Vicodin for a longer duration"), *adopted by* No. CV 09-558 (SJF) (AKT), Dkt. 82 (Order, dated July 13, 2010); *see also Veloz v. State of New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (finding inmate's claim that defendants should have provided "stronger pain medication than Tylenol" to manage plaintiff's back pain merely "amount[ed] to a disagreement over the appropriateness of a particular prescription plan" and did not rise to the level of an Eighth Amendment violation), *aff'd*, 2006 U.S. App. LEXIS 10533 (2d Cir., Apr. 24, 2006).

Here, too, Plaintiff's claim against Mamis in this action is subject to dismissal. Plaintiff himself concedes that, on the Friday of his accident, he was examined by Mamis for his complaints of pain and that Mamis gave him ibuprofen (see Compl., Attachment at B; Pl. Aff. at

¶ 8), which, despite Plaintiff's characterization to the contrary, is a pain medication (*see* n.5, *supra*).  Plaintiff's suggestion that Mamis then interfered with another doctor's treatment plan is belied by Plaintiff's own allegations.  Although this other doctor allegedly prescribed Percocet for Plaintiff on Friday evening (after Plaintiff had originally been given ibuprofen by Mamis earlier that day), he did so, according to Plaintiff, based solely on Plaintiff's subjective complaints of pain and without ever examining Plaintiff, and he explicitly instructed Plaintiff to return to Mamis for follow-up.  (*See* Compl., Attachment at B (the physician gave Plaintiff "instructions to see Defendant Dr. Mamis on Monday")).)  Even accepting as true that Mamis canceled the Percocet prescription on the following Monday without first re-examining Plaintiff, this would be insufficient to constitute a constitutional violation.  Plaintiff concedes that he was still able to obtain ibuprofen at that time and that Mamis saw him again on Tuesday, only one day later.  (*See* Compl., Attachment at C.)  Especially in light of the fact that Mamis had already examined Plaintiff only a few days before and that, when he saw him again, he adhered to his prior views as to Plaintiff's appropriate treatment, the one-day delay in seeing Plaintiff for follow-up cannot objectively be said to manifest disregard for "an excessive risk to [Plaintiff's] health or safety," *Chance*, 143 F.3d at 702 (quotation marks and citation omitted).  Further, while not itself dispositive, Plaintiff concedes that his pain subsided after only a few days, casting at least some doubt on the objective seriousness of Plaintiff's underlying condition.  Viewed in its entirety and in light of all of the circumstances, Mamis's conduct simply cannot be deemed to have deprived Plaintiff of "the minimal civilized measure of life's necessities,"

*Salahuddin*, 467 F.3d at 279, and, accordingly, cannot form the basis of an Eighth Amendment violation.[15]

Accordingly, I recommend that Plaintiff's deliberate indifference claim against Mamis be dismissed.

### 5. Claims Against Connolly, Pelc, and Good

Plaintiff alleges that Connolly, Pelc and Good did not adequately respond to Plaintiff's complaints about law library access and difficulty obtaining legal materials.  (Pl. Aff., ¶ 16; *see also* Compl., Attachment at H-I.)[16]  Plaintiff also alleges that Lujan denied him law library access at or around the same time period.  (Pl. Aff., ¶ 16.)  With these allegations, Plaintiff apparently seeks to assert a constitutional claim that he was denied access to the courts.  *See Shepherd v. Fraisher*, No. 96 Civ. 3283 (JGK), 1999 U.S. Dist. LEXIS 13937, at *14 (S.D.N.Y. Sept. 11, 1999) ("[t]he Constitution guarantees prisoners meaningful access to the courts and, unless adequate alternatives exist, reasonable access to a law library is a required part of that access").  Defendants contend that such a claim is unexhausted and, in any event, lacks merit. As it is clear from Plaintiff's Complaint and opposition papers that he has failed to state an access to courts claim, the claim should be dismissed on that basis, regardless of exhaustion.

---

[15] Plaintiff's additional allegation that Mamis has a "known history" of deliberately refusing to treat of inmates with non-fatal but painful conditions (Pl. Aff. at ¶ 9), even if taken as true, is also insufficient to suggest that, by prescribing one pain medication instead of another, Mamis was, in this case, deliberately indifferent to Plaintiff's serious medical needs.

[16] To the extent that Plaintiff alleges that Connolly failed to intervene to stop Croom's and Dawley's retaliation against Plaintiff (*see* Compl., Attachment at B), such allegations do not support a constitutional claim against Connolly because plaintiff has not adequately alleged personal involvement pursuant to the test set forth in *Colon* (*see* Discussion, Section II(B)(2), *supra*).

In order to violate an inmate's right of access to the courts, a defendant's conduct must cause the inmate "actual injury," in that a legal action that he sought to pursue must have been "materially prejudiced" by the defendant's actions. *Smith v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995); *see also Lewis v. Casey*, 518 U.S. 343, 350 (1996) (noting need to show "actual injury"); *Key v. Fischer*, 05 Civ. 10461 (SHS) (GWG), 2007 U.S. Dist. LEXIS 65901, at *10 (S.D.N.Y. Sept. 6, 2007) (Report & Recommendation), *adopted by* 2007 U.S. Dist. LEXIS 72513 (S.D.N.Y. Sept. 28, 2007). "[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the Constitution requires that inmates be provided the tools needed "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id.* "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*; *see Collins v. Goord*, 438 F. Supp. 2d 399, 415-16 (S.D.N.Y. 2006).

Plaintiff contends that, because of Defendants' alleged refusal to allow him access to the law library, legal materials, and legal assistance, he was unable to prepare an adequate defense in his Tier II disciplinary hearing, unable to prepare an adequate appeal to the adverse ruling issued in that hearing, forced to write portions of his Complaint on the backs of blank forms instead of on blank sheets of paper, and unable to make copies of his court filings. (*See* Compl., Attachment at H; Pl. Aff. at ¶ 16.) He further alleges that he had to file a reply in his Article 78 proceeding during the relevant time period. (Compl., Attachment at H.)

None of these allegations give rise to an access to courts claim.

a.     **Plaintiff's Alleged Disciplinary Hearing and Appeal**

Plaintiff's constitutional right to court access did not require him to receive access to legal materials or legal assistance in order to prepare for his disciplinary hearing and appeal. Prisoners' constitutional right to court access, which is grounded in the "constitutional right to petition the Government for redress of their grievances," *Hudson v. Palmer*, 468 U.S. 517, 523 (1984), encompasses only that access needed to "attack their sentences . . . [or] challenge the conditions of their confinement," *Lewis*, 518 U.S. at 354.   The relevant precedent generally deals with access to *courts*, not to prison administrative proceedings.  *See Lewis*, 518 U.S. at 350-51 (citing cases).   Accordingly, it has been held that an alleged inability to present a meaningful defense in a prison disciplinary hearing does not give rise to an access to courts claim.  *See Nicholas v. Remillard*, No. 92-CV-900, 1997 U.S. Dist. LEXIS 18113, at *14-16 (N.D.N.Y. Nov. 13, 1997).

As Plaintiff's defense against prison disciplinary charges does not, by itself, implicate the constitutional right to access to courts, and as Plaintiff has not alleged that his disciplinary hearing or appeal undermined any potential challenges to Plaintiff's sentence or conditions of confinement, I recommend that Plaintiff's access to courts claim be dismissed, to the extent any such claim is based on Plaintiff's disciplinary hearing and appeal.  *See Smith v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995) (dismissing access to courts claim where plaintiff had "offer[ed] no facts to explain how the destruction of his legal papers prejudiced his ability to seek redress from the judicial system").

### b.      Plaintiff's Alleged Difficulties Pursuing This Action

Plaintiff has also alleged that he had difficulty obtaining necessary supplies and making copies while pursuing his pending action in this Court.  He has not alleged, however, that he suffered any actual injury in this action.  Indeed, Plaintiff was able to serve and file his Complaint despite his alleged inability to copy it before filing, and the Court has had no difficulty reading the Complaint even though some of its pages were written on the backs of forms instead of blank sheets.  Whatever setbacks Plaintiff purportedly suffered as a result of Defendants' alleged conduct, they do not appear to have been so severe as to impede Plaintiff's pursuit of the pending action, and without any specific alleged injury, the alleged setbacks are insufficient to give rise to a claim for denial of access to courts.  *See Collins v. Goord*, 438 F. Supp. 2d at 418 (alleged destruction of typewriter and failure to provide pens did not give rise to court access claim where plaintiff had failed to allege any "actual injury" caused by these deprivations); *cf. id.* at 416-17 (alleged inability to make photocopies gave rise to court access claim where plaintiff's Article 78 proceeding had required him to submit a photocopy, he had been unable to do so, and his action had been dismissed for failure to effect service).

### c.      Plaintiff's Article 78 Proceeding

Finally, with respect to Plaintiff's Article 78 proceeding, he has not alleged any injury at all.  Plaintiff alleges only that he had to file a reply in an Article 78 proceeding during the period when he claims to have been denied access to legal materials and legal assistance.  Plaintiff does not, however, allege any further facts about that proceeding, his reply filing, or the outcome; accordingly, his sparse allegations are insufficient to suggest the requisite "actual injury" necessary to state an access to courts claim.  *See Christopher v. Harbury* 536 U.S. 403, 415-16

(2002) (as a pleading matter, the inmate must lay out a description of the purportedly-compromised underlying action in sufficient detail so that a court may "determine whether the 'arguable' nature of the underlying claim is more than hope"); *Key*, 2007 U.S. Dist. LEXIS 65901, at *11.

In sum, Plaintiff has not alleged any "actual injury" giving rise to a claim for denial to access to courts.

### 6.   Claims Against Lujan

Plaintiff's allegations against Lujan are (1) that she looked at Plaintiff's grievance and Article 78 papers in the law library, and (2) that she retaliated against Plaintiff by refusing him law library access while he was in "keeplock."  (Compl. at ¶ II(D); *id.*, Attachment at A; Pl. Aff. at ¶ 16.)  Defendants correctly contend that such allegations do not give rise to any constitutional claims against CO Lujan.

### a.   Lujan's Alleged Reading Of Plaintiff's Legal Papers

Plaintiff's allegation that Lujan looked at Plaintiff's legal papers does not, based on the facts presently alleged, give rise to any constitutional claim against Lujan.  Inmates do not have a free-standing privacy right that prevents prison officials from inspecting inmates' belongings. *See Soldal v. Cook County*, 506 U.S. 56, 65 (1992) ("an inmate, because of his status, enjoy[s] neither a right to privacy in his cell nor protection against unreasonable seizures of his personal effects" (citing *Hudson v. Palmer*, 468 U.S. 517, 526-28 (1984))).  Furthermore, although the Constitution protects an inmate's right to pursue legal actions without undue interference by prison officials, such a claim must dismissed if Plaintiff has not alleged any "actual injury."  (*See* Discussion, Section II(B)(5), *supra*.)  Here, Plaintiff has not alleged any actual injury resulting

from Lujan's alleged perusal of his legal papers, and this claim against Lujan should therefore be dismissed.

### b.   Lujan's Alleged Retaliation Against Plaintiff

Plaintiff likewise fails to state a claim for retaliation against Lujan.  Although Plaintiff does not appear to assert any such retaliation claim against Lujan in his initial Complaint, Plaintiff asserts in his opposition papers that Lujan "retaliat[ed]" against him by denying him access to legal materials.[17]  (Pl. Aff. at ¶ 16.)  As Defendants correctly contend (*see* Def. Reply Mem. at 4), this "threadbare" allegation is insufficient to meet the pleading requirements of *Twombly* and *Iqbal* because, among other things, Plaintiff does not allege what specific conduct Lujan was retaliating against.  *See Sloane v. Mazzuca*, No. 04 Civ. 8266 (KMK), 2006 U.S. Dist. LEXIS 79817, at *44 (S.D.N.Y. Oct. 31, 2006) ("[b]ecause prisoners' claims of retaliation are prone to abuse, the Court approaches [p]laintiff's claims with justifiable caution and some skepticism . . . [t]hus, to survive a Motion to Dismiss, a retaliation claim must be pled with specificity").

Even assuming that the protected speech at issue was Plaintiff's grievance against Lujan (*see* Background, Section B, *supra*), Plaintiff has failed to make any non-conclusory allegations establishing a causal connection between that protected speech and Lujan's alleged adverse action.  *See Dawes v. Walker*, 239 F.3d at 492 ("a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing:  (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that

---

[17] To the extent Plaintiff seeks to assert an access to courts claim against Lujan for her alleged refusal to let Plaintiff use the law library (*see* Pl. Aff at ¶ 16), such a claim should be dismissed for the reasons discussed in Section II(B)(5), *supra*.

there was a causal connection between the protected speech and the adverse action"). The three

month time lapse between Plaintiff's grievance and Lujan's alleged retaliation "strongly suggests

that there is no causal connection between these events." *Sloane v. Mazzuca*, 2006 U.S. Dist.

LEXIS 79817, at *50 (dismissing retaliation claim based upon four-month time lapse). Plaintiff

has alleged no other facts suggesting a causal connection; accordingly, his retaliation claim

against Lujan should be dismissed.

This Court respectfully recommends dismissal of all claims against Lujan.

## III.  PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

On April 16, 2009, as noted above, the Court converted Plaintiff's application for an

order to show cause into a motion for a preliminary injunction. (*See* Dkt. 5.) In May 2010,

presumably in light of the passage of time and relevant intervening events, Plaintiff clarified

exactly what injunctive relief he still seeks. (*See* Pl. Aff., ¶ 17.) Plaintiff now seeks:

(1) expungement of "the false misbehavior report"[18] from his prison record, and (2) an

immediate transfer to another facility because he is unable to obtain any legal assistance at

Fishkill. (*Id.*) Plaintiff's motion for a preliminary injunction should be denied.

In general, to succeed on a motion for a preliminary injunction, a party must show

"(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on

the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly in the movant's favor." *NXIVM Corp. v.*

*Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004) (citing *ABKCO Music, Inc. v. Stellar Records, Inc.*,

---

[18] In his most recent submission on this issue, Plaintiff refers to allegedly false
misbehavior reports filed by both Croom and Dawley but does not specify which of those reports
he wants expunged. (*See* Pl. Aff. at ¶ 17.) The Court will thus treat Plaintiff's request as one for
the expungement of both misbehavior reports.

96 F.3d 60, 64 (2d Cir. 1996)).  Where, however, the requested injunction will alter, rather than maintain, the *status quo,* the movant faces a more rigorous standard with respect to the "merits" prong of the analysis – he must make a "clear" or "substantial" showing of likelihood of success. *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149-50 (2d Cir. 1999); *see also Lennon v. Premise Media Corp., L.P.*, 556 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2008).  In this case, Plaintiff seeks an injunction directing that a misbehavior report be expunged from his record and that he be transferred to another facility.  (Pl. Aff., ¶ 17.)  To succeed on his motion with respect to either of these forms of relief, he is required to establish a "clear" or "substantial" likelihood of success on the merits of the pertinent underlying claims.

Plaintiff's request that a false misbehavior report be expunged from his record should be denied because Plaintiff has not made a "clear" or "substantial" showing of likelihood of success on his underlying claims.  Indeed, as explained above (*see* Discussion, Section II(B)(3), *supra*; n.4, *supra*), Plaintiff has not even demonstrated at this juncture that he has any viable federal claim arising from any misbehavior report filed against him.  His challenge to Croom's allegedly false misbehavior report appears to be unexhausted, and potential claims regarding Dawley's allegedly false misbehavior report are not properly before this Court because Dawley has not been named as a defendant or served.  Plaintiff cannot side-step essential procedural requirements, such as exhaustion and service of process, merely by dressing up his claims as requests for preliminary injunctive relief.  *See, e.g.*, *McClenton v. Menifee*, 05 Civ. 2844 (JGK), 2006 U.S. Dist. LEXIS 60297, at *52 (S.D.N.Y. Aug. 29, 2006) (denying motion for preliminary injunction where the underlying claim "[was] not included in the complaint and there [was] no showing that the plaintiff [had] exhausted his administrative remedies with respect to [that]

claim").  Because Plaintiff has not shown a likelihood of success with respect to any claim arising from allegedly false misbehavior reports, his request for a preliminary injunction expunging his record should be denied.

Plaintiff's request for transfer to another facility should also be denied, not only because he has failed to show a likelihood of success on the merits, but also because he has failed to demonstrate that he will suffer irreparable harm in the absence of injunctive relief.  Plaintiff has not shown that either of his proffered reasons for a transfer – access to legal assistance and fear of retaliation – provide grounds for any sustainable claims against Defendants.  (*See* Discussion, Section II(B)(6), *supra* (recommending dismissal of claims based on alleged withholding of legal assistance); *id.*, Sections II(B)(3)(b), II(B)(6)(b), *supra* (recommending dismissal of retaliation claims).)  In addition, Plaintiff has not identified any particular irreparable injury that he would face in the absence of a transfer.  Based on Plaintiff's recent submissions to the Court, it does not appear that he is still being denied law library access; his submissions opposing Defendants' motion to dismiss were typewritten, contained numerous legal citations, and were submitted in triplicate.  (*See* Pl. Aff.)  Likewise, with respect to his fear of retaliation, Plaintiff's papers (as Defendants point out) "do not identify any adverse action taken against him for at least the past year."  (Def. Reply Mem. at 10.)  Plaintiff's general fear of future retaliation by Defendants is too speculative to warrant injunctive relief, *see Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999) ("conjectural" fear of future retaliation does not constitute irreparable harm sufficient to warrant a preliminary injunction), and Plaintiff's request for an immediate transfer should therefore be denied.

For these reasons, this Court recommends that Plaintiff's motion for a preliminary injunction (Dkt. 5) be denied in its entirety.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend (1) that Plaintiff's motion for a preliminary injunction (Dkt. 5) be denied, and (2) that Defendants' motion to dismiss (Dkt. 21) be denied insofar as its seeks the dismissal of Plaintiff's claims against defendant Montgomery in his individual capacity, and granted in all other respects, without prejudice to amend, should Plaintiff be able to allege additional facts sufficient to cure the pleading defects discussed herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, United States Courthouse, 500 Pearl Street, Room 1010, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Stein. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988)*; McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983). If Petitioner does not have access to cases cited herein that are reported on LEXIS, he should request copies from Defendants' counsel. *See*

*Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir. 2009) (noting that the Court may ask opposing

counsel to provide, to a *pro se* litigant, copies of decisions that are available only electronically).

Dated: New York, New York
      September 1, 2010

                                  Respectfully Submitted,

                                    DEBRA FREEMAN
                                    United States Magistrate Judge

Copies to:

Hon. Sidney H. Stein, U.S.D.J.

Mr. Richard Salvatierra
97-B-1915
Fishkill Correctional Facility
P.O. Box 1245
Beacon, NY 12508

Steven N. Schulman, Esq.
New York State Office of the Attorney General
120 Broadway
New York, NY 10271